**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

COLETTE L HACKMAN,        )
                                    )
            Plaintiff,      )
            vs.            )     No.  2:12-CV-54-APR
                                    )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security   )
                                    )
            Defendant.    )

OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the

Commissioner of Social Security filed by the claimant, Colette L. Hackman, on April 20, 2012.

For the following reasons, the decision of the Commissioner is **REMANDED.**

Background

The plaintiff, Colette L. Hackman, applied for Disability Insurance Benefits and

Supplemental Security Income on July 2, 2010, alleging a disability onset date of June 5, 2010.

(Tr. 191)  Her claim initially was denied on August 2, 2010, and again denied upon

reconsideration on October 20, 2010.  (Tr. 125, 139)  Hackman requested a hearing before an

Administrative Law Judge ("ALJ").  (Tr. 153–54)  A hearing before ALJ Ed Studzinski was held

on June 15, 2011, at which Hackman and vocational expert Dr. Leonard Fisher testified.  (Tr.

43–120)

On July 8, 2011, the ALJ issued his decision denying benefits.  (Tr. 23–42)  The ALJ

found that Hackman was not under a disability within the meaning of the Social Security Act

from June 5, 2010, through the date he issued his decision.  (Tr. 23–42)  Following a denial of

Hackman's request for review by the Appeals Council, she filed her complaint with this court.

Hackman was born on July 30, 1957, making her 53 years old on the date of the ALJ's decision. (Tr. 212)  She is 5'11" in height and weighs approximately 190 pounds. (Tr. 51)  Hackman is single with no minor children and lives with her brother and his wife. (Tr. 80)  She has completed four or more years of college and last worked as a teacher's aide for physically handicapped children in June of 2010. (Tr. 216–217)  Hackman held this position for more than 30 years before she stopped working. (Tr. 74)  She stopped working because the school year ended and she also had to have surgery on her back due to a herniated disc and a pinched nerve. (Tr. 74)  Hackman has not worked since because of the ongoing pain she describes. (Tr. 75–77)

Hackman first consulted Dr. John M. Diveris in October of 2008, for swelling and pain in her left leg.  Dr. Divaris diagnosed Hackman with left knee arthralgia and a left knee medial meniscus tear. (Tr.531)  An MRI later that month showed chondral degenerative changes and a popliteal cyst and confirmed the medial meniscus tear. (Tr. 591)  In December of 2008, Hackman reported pain, discomfort, and difficulty sleeping. (Tr. 529)

In March of 2010, Hackman was admitted to St. Catherine Hospital for rectal bleeding and hemorrhoid pain, at which time she was diagnosed with hemorrhoids and hypertension and discharged with medication prescriptions. (Tr. 271–73)  In April of 2010, she again was admitted to St. Catherine Hospital for a colonoscopy because of rectal bleeding. (Tr. 279, 281)  The doctor found severely inflamed internal hemorrhoids. (Tr. 281)  In May of 2010, Dr. Thomas Hoess diagnosed Hackman with facet hypertrophy and desiccation of the L4-L5 and L5-S1 intervertebral discs, loss of disc space height at the L5-S1 level, L5 inferior endplate irregularity, left paracentral disc herniation, extension of disc material caudally into the left lateral recess, and a mild broad-based posteriorly bulging disc at the L4-L5 disc space level. (Tr.

283)

The next week, Hackman went to Community Hospital for elevated blood pressure, a headache, and chest pain. The doctor reported hypertension, cardiomegaly, and increased density in the lung bases. (Tr. 289–91, 301) Hackman also complained of constipation, difficulty walking, shooting leg pain, and a numb or tingling sensation. An MRI showed a large extruded fragment at the L5-S1 with compression of the left lateral recess and evidence of the L5-S1 disc in an extraforaminal location. (Tr. 310) Dr. Wayel Kaakaji diagnosed sacral radiculopathy. (Tr.319) A follow up appointment revealed that Hackman continued to experience severe pain radiating down the left thigh, into the left calf, and down to her foot. Dr. Kaakaji recommended a microdisectomy procedure. (Tr. 318)

By the end of May 2010, Hackman described her pain to Dr. Donald W. Kucharzyk as extreme and severe over the past month. (Tr. 451) Dr. Kucharzyk reported that the spine problem had worsened since Hackman's onset date and recommended spinal fusion intervention. (Tr. 451, 456) On June 3, 2010, Hackman was admitted to the hospital for this treatment. (Tr. 365) In his preliminary report, Dr. Kucharzyk noted that Hackman continued to experience increasing discomfort in her lower back region and that the conservative treatment she had received to date had provided no improvement. (Tr. 365) That day Dr. Kucharzyk diagnosed Hackman with lumbar spondylosis with spondylotic segmental instability with extruded herniated nucleus pulposus, L5-S1 left with facet arthropathy with central neural foraminal and lateral recess stenosis with left L5-S1 radiculopathy, mild cardiomegaly, and increased density at the right lower lung. (Tr. 367) Reports from the following day show a pectus excavatum deformity and a thoracic aortic aneurysm. (Tr.329)

On June 9, 2010, Hackman underwent a posterior spinal fusion. (Tr. 333) After surgery, Hackman saw Dr. Roche for an inpatient occupational therapy basic evaluation, during which she experienced significant back pain. (Tr. 330) Hackman's potential to rehabilitate was projected as good. (Tr. 429) The next day, Hackman had some noted progress toward her goals, but her rehabilitation potential was said to be fair. (Tr. 434) On June 11, 2010, Dr. Rajshri Shah noted mild degenerative changes at the spine. (Tr. 345) On June 13, Hackman was discharged with restrictions on heavy lifting, pushing or pulling, driving, bending or stooping, and sexual activity, and she was directed to take tub or sponge baths and not to return to work without approval. (Tr. 356–57)

At a postoperative visit on June 24, 2010 with Dr. Kucharzyk, Hackman stated that she experienced pain and stiffness. (Tr. 447) On a July 9 visit, Hackman still experienced stiffness, but she said that her leg pain had stopped. (Tr. 487)

At the hearing before the ALJ, Hackman testified that she started living with her brother and his wife in March of 2010. (Tr. 52) She had to move out of her previous apartment because of her lack of income and because her short term disability payments had stopped after six months. (Tr. 53) She drove and had a valid driver's license. (Tr. 53)

Hackman testified that she stopped working as a teacher's assistant for handicapped preschoolers in June of 2010 because she was experiencing pain shooting from her buttocks on the left side to her foot and could hardly stand, walk, or perform her job. (Tr. 54) She indicated that it was only her left leg experiencing pain at that time. (Tr. 56) She also had difficulty with her left knee since 2008, and reported pain and swelling. (Tr. 56) Hackman went to the emergency room in May of 2010. (Tr. 73–74) The emergency room doctor diagnosed her with a

pinched nerve and a herniated disc and recommended surgery.  (Tr. 74) Hackman waited until the school year was over to have the surgery.  (Tr. 73-74)

Hackman then testified that she could not work because she could not sit or stand for long periods of time, bend without pain, or lift anything.  (Tr. 57)  She was not able to perform her job fully before the school year was out, and she had to have others help her do her job.  (Tr. 75)  She indicated that she had surgery on her back in June of 2010 and on her knee in September of 2010.  (Tr. 57)  She stated that her doctors said she could not lift the children at her work, a case of water, or a gallon of milk.  (Tr. 58)  Hackman also reported that her job still was available to her if she was able to perform the physical work when classes resumed.  (Tr. 75)

Hackman further testified that after the surgery she experienced back pain, a numb heel, and continued pain in her leg and buttock that did not improve.  (Tr. 76)  She explained that when she was at physical therapy and in a harness with ice on her back the pain would cease but would return when she left.  (Tr. 77)  She no longer was having physical therapy because her insurance would not pay for it.  (Tr. 78)  Hackman was able to drive for about 15 minutes at a time before her back started to hurt, her knee swelled, and her right heel went numb.  (Tr. 79)  She was able to stand for about 15-20 minutes before her back and knee began to hurt and her foot went numb.  (Tr. 80)  Her brother and his wife did her grocery shopping.  (Tr. 80)  Her sister-in-law did her laundry, although Hackman was able to fold it.  (Tr. 80–81)  Her sister-in-law did all the household cleaning.  (Tr. 81)

Hackman testified that sometimes she used a pillow to help alleviate the pain when she was sitting.  (Tr. 81)  Also to help with the pain, Hackman used medication and ice 2-3 times a day for 15 minutes at a time.  (Tr. 82–83)  This usually alleviated her pain for approximately 30

minutes. (Tr. 84) When she cooked, she only made something light, like a sandwich. (Tr. 84) She left her home only once or twice a week. (Tr. 85) She testified that she no longer could sing in her church, which she used to visit four times a week. (Tr. 85–86) She could walk less than a block and only lift a half-gallon of milk. (Tr. 86–87) She would lay down when her back hurt and applied ice about twice a day for about 30 minutes each time. (Tr. 88) She could not bend over and pick things up without pain. (Tr. 88) She had a hard time getting back up if she kneeled down. (Tr. 88) She could not comfortably walk up and down stairs. (Tr. 88) When she did use the stairs, she had to descend sideways and hold onto the rails. (Tr. 89) She used a walker from the time of the surgery until August of 2010. (Tr. 89) She also experienced pain at night, which caused her trouble with sleeping. (Tr. 89–90)

Hackman testified that on an average day she woke up at 7:00 A.M. but that she did not get out of bed till 10:00 A.M. (Tr. 90) She took about 15-20 minutes to get up and out of bed because of the pain and numbness. (Tr. 90) She read one page of devotional literature. (Tr. 90) She typically would watch television, but sometimes she sometimes fell asleep, either because she did not sleep well or her medication made her tired. (Tr. 91)

She then testified that she had one surgery on her knee in 2010. (Tr. 91–92) She had problems with hemorrhoids all the time and visited the emergency room 1-2 times per month because of them. (Tr. 92) She had this problem since 1975. (Tr. 93–94) She used medication and a stool softener for this problem. (Tr. 94)

Dr. Leonard Fisher, a vocational expert, then testified that Hackman was a substitute teacher, listed as Dictionary of Occupational Titles number 092.227-010, with a specific vocational preparation ("SVP") of 7, which is light work. (Tr. 97) He also said she was a

teacher's aide, listed as number 355.377-018, which is skilled medium work with an SVP of 6. (Tr. 100)

The ALJ posed a series of hypothetical questions. (Tr. 103–09) First, the ALJ asked the VE to assume that an individual was capable of: performing light work; able to lift a maximum of 20 pounds occasionally; able to lift 10 pounds frequently; could stand and walk six hours in an eight-hour workday; had postural limitations; could not climb ladders, ropes, or scaffolds; occasionally could climb ramps and stairs; occasionally could stoop, kneel, crouch, and crawl; and could not work in hazardous environments. (Tr. 103–04) The ALJ asked if this individual could perform any of Hackman's past jobs. (Tr. 104) The VE testified that the individual could perform work as a substitute teacher. (Tr. 104)

The ALJ then listed three types of light work: light because it required standing and walking, but not heavy lifting; light because it predominantly was done seated; or light because it demanded alternation between sitting and standing. (Tr. 106) The ALJ asked if Hackman's skills would transfer to any of these three types of light work. (Tr. 105–06) The VE answered that a teacher's aide is light work that sometimes requires sitting and standing and that the level of light lifting and allowance for frequent alteration of position was appropriate. (Tr. 106)

The ALJ asked if Hackman's skills could transfer to any other jobs if he limited her to sedentary work with postural and environmental limitations. (Tr. 106) The VE testified that they would not transfer to any sedentary work. (Tr. 107)

The ALJ asked if the teacher's aide job could be performed with some sitting and standing at the light level with lifting up to 20 pounds. (Tr. 107) The VE testified that an individual who could not stand for more than an hour at a time could perform this job. (Tr. 107)

The VE further testified that an individual who could not stand more than fifteen minutes at a time could not perform this job. (Tr. 107)

The ALJ then asked if Hackman's skills were transferable to any other light jobs. (Tr. 107) The VE answered that they would transfer to a preschool teacher. (Tr. 108) The ALJ asked if this job would be more or less physically demanding than the jobs of a substitute teacher and teacher's assistant. (Tr. 109) The VE said it would be the same as a substitute teacher but less than the teacher's aide because of the lifting. (Tr. 109)

The ALJ asked if there were any non-teaching jobs her skills would transfer to. (Tr. 109) The VE said no. (Tr. 109)

The VE then testified that the requirements for a preschool teacher and an aide were different because the aide work is heavier. (Tr. 111) The VE defined transferable skills as the skills a person learns while working on a job. (Tr. 112) He also noted that he had been in the vocational rehabilitation field since 1964 and had all kinds of training. (Tr. 114–15) He noted that an individual probably could not take more than two days off per month and stay in competitive work. (Tr. 119)

In his decision the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled. (Tr. 27–28) The ALJ found that Hackman met the insured status requirements of the Social Security Act through December 31, 2014. (Tr. 28) At step one, the ALJ found that Hackman had not engaged in substantial gainful activity since June 5, 2010. (Tr. 28) At step two, the ALJ found that Hackman had several severe impairments including: status post lumbar fusion, meniscus tear, degenerative disk disease, and degenerative joint disease. (Tr. 28–29) At step three the ALJ found that Hackman did not have

8

any one impairment or any combination of impairments that met or medically equaled one of the possible impairments from 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 29)  In particular Hackman's degenerative joint disease and meniscus tear did not equal a 1.02 listing because she had not lost the ability to ambulate effectively.  (Tr. 29)  Also, Hackman's degenerative disk disease and status post lumbar fusion did not equal a 1.04 listing because her straight leg raising tests were negative, she did not have a record of spinal arachnoiditis, and she could walk for up to 35 minutes.  (Tr. 29)  In addition, Hackman's hypertension did not meet the 4.00 listings because it was not severe enough.  (Tr. 29)  Furthermore, Hackman's hypothyroidism did not meet the 9.00 listing because there was no damage to her kidneys.  (Tr. 29)

In determining Hackman's RFC, the ALJ stated that he considered the entire record and found that Hackman had the capacity to perform light work; could carry and lift up to 20 pounds occasionally; could carry and lift up to 10 pounds frequently; could sit for six hours; could stand and/or walk for up to six hours; never could climb ladders, ropes, or scaffolds; occasionally could climb ramps and stairs; occasionally could balance, stoop, kneel, crouch, and crawl; and had to avoid exposure to hazards.  (Tr. 29–30)

In determining Hackman's RFC, the ALJ discussed a two-step process in which he first must determine if there was a medically acceptable basis for her complaints, and second decide if this impairment could be expected to produce the pain and symptoms described.  (Tr. 30)  The ALJ found that Hackman's medically determinable impairments could be expected to cause the described symptoms, but the intensity, persistence, and limiting effects were inconsistent with the RFC, and thus not credible.  (Tr. 30)

The ALJ noted that the exhibits showed that Hackman only was limited by her

impairment, not disabled. (Tr. 30–31) She had improved over time with treatment, and there was no evidence that her condition had worsened. (Tr. 31) She was not disabled for the minimum of a continuous twelve months, and there was not a long history of back pain. (Tr. 31) In addition, Hackman recovered very well after surgery and soon was able to walk again. (Tr. 31) She reported her pain as a two out of ten on a ten-point scale only a month after surgery and later reported a zero out of ten for pain on a ten-point scale. (Tr. 31) She soon could walk for thirty-five minutes, lift a gallon of milk, and drive for short distances. (Tr. 31) She continued to receive reports of improvement. (Tr. 31) Her therapy progressed as expected, and her tests came back with no significant findings. (Tr. 31)

The ALJ further reported that Hackman's knee improved before and after surgery. (Tr. 32) She was able to ambulate the same day as the surgery. (Tr. 32) She needed very little treatment after the surgery and complained very little about her knee after the surgery. (Tr. 32) She completed gait training. (Tr. 32) She continued to show improvement and most recently was reported to have no abnormal gait. (Tr. 31) Furthermore, there was no evidence that Hackman's knee would have prevented her from working. (Tr. 32)

Next, the ALJ discussed the credibility of Hackman's testimony. (Tr. 32) Hackman stated that she left her job for reasons that were not related to her symptoms. (Tr. 32) She stated that she had no back pain before her surgery but her records are to the contrary. (Tr. 32) Similarly, Hackman said she could not lift a gallon of milk, but her records indicated she could. (Tr. 32) In addition, there was nothing in the record about Hackman's need to lie down throughout the day. (Tr. 32)

Finally, the ALJ explained that he gave little weight given to Dr. Kucharzyk's opinion

because crucial portions were left blank and not assessed. (Tr. 33) For example, Dr. Kucharzyk did not assess Hackman's ability to walk. (Tr. 33) Also, Dr. Kucharzyk did not address Hackman's symptoms, he just referred to his notes. (Tr. 33) His notes indicated that Hackman had improved recently and that further work-up was needed to assess her ability to work. (Tr. 33) This work-up never was completed. (Tr. 33) Thus, Dr. Kucharzyk's opinion was given little weight, because of its inconsistencies. (Tr. 33)

With the RFC determined at step four, the ALJ found that Hackman could perform past relevant work either as a teacher's aide or as a substitute teacher and was not disabled. (Tr. 34) Therefore, the ALJ did not evaluate step five. (Tr . 34)

<u>Discussion</u>

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 852 (1972)(*quoting* **Consolidated Edison Company v. NRLB**, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed.2d 140 (1938)); *See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th

11

Cir. 2004); ***Scott v. Barnhart***, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez***, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable " to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. § § 404.1520, 416.920**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R.§§ 404.1520(b), 416.920(b).** If she is, the claimant is not disabled and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c), 416.920(c).** Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1.** If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be

found not disabled. **20 C.F.R. §§ 404.1520(e), 416.920(e).** However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f).**

Hackman raises two challenges to the ALJ's denial of Disability Insurance Benefits and Supplemental Security Income. Hackman claims there is a lack of substantial evidence supporting the ALJ's RFC and credibility determinations. Regarding the first challenge, Hackman argues that the ALJ failed to consider all relevant evidence when he determined that Hackman could perform past relevant work. First, Hackman argues that the finding that she could perform past relevant work is erroneous because the DOT position provided by the VE for a substitute teacher did not exist and that the DOT number cited for the teacher's aide position was for a mental-retardation aide. Although the ALJ misstated the DOT numbers, the ALJ stated the title of the positions so that it was clear that the ALJ was referring to the substitute teacher and regular teacher's aide positions. Remanding the case for the ALJ to state the proper DOT number when the position was identified properly by title would be futile and would not change the outcome of the Hackman's claim. A case should not be remanded because of a harmless error that does not affect the outcome. *Glover v. Astrue*, No. 208–cv–262, 2010 WL 989934, at *9 (N.D. Ind. Mar. 16, 2010).

Hackman next argues that she only worked as a substitute teacher occasionally, three or four times a month, thus she had not acquired the knowledge and skills required for the job and

had not performed this position long enough for it to be considered past relevant work. The ALJ relied on an earnings record to support his finding that the substitute teacher position was substantial gainful activity and thus included as Hackman's past relevant work. Hackman argues that the ALJ's reliance on the earnings record was not well founded because it did not distinguish between her earnings as a substitute teacher and as a teacher's aide, so it was impossible to determine what amount of time was spent performing the duties of a substitute teacher. The Commissioner does not address this argument in his response brief, nor did the ALJ explain how he determined how much time Hackman spent performing the duties of teacher's aide from her earnings record. The only evidence of that allotment appears to be Hackman's own testimony.

Although the ALJ primarily looks at earnings when determining past relevant work, the ALJ is not confined to this consideration. Hackman had her license to be a substitute teacher at the time of her disability onset and had held such a license in the past. This suggests that she had the knowledge and skills required for the job. The ALJ also explained that Hackman performed this job long enough to learn the skills.

The ALJ could not differentiate how much time Hackman spent performing each job, however, the record reflects that together Hackman was able to engage in substantial gainful activity by performing both jobs. Regardless, Hackman does not dispute that her past work as a teacher's aide was performed to such an extent to constitute substantial gainful activity. Even if Hackman's work as a substitute teacher could not have been considered by the ALJ because it was not performed often enough, her work as a teacher's aide was past relevant work, which the ALJ found that Hackman could continue to perform in light of her disabilities. Remanding to

address whether her work as a substitute teach would be past relevant work would not provide a basis on which to overturn the ALJ's disability determination.

Hackman next argues that the ALJ failed to consider evidence of her ongoing impairments. Hackman contends that although there were reports of her progress, there also were reports of her continued pain that the ALJ ignored. Specifically, some of the notes indicated that she was progressing as expected, but they did not elaborate on her precise condition. She continued to report lower back pain that radiated down her left leg and increased pain when she was standing, sitting, bending, lifting, driving, pushing, and climbing. Hackman reported persistent pain throughout her lower back, which affected her ability to stand and her mobility.

The ALJ must look at all Hackman's statements about her symptoms, but statements about pain alone do not prove a disability. *See* **20 C.F.R. § 416.929(a) (2011)**; ***Donahue v. Barnhart***, 279 F.3d 441, 444 (7th Cir. 2002). An ALJ may not, "discredit a complaint of pain simply because a plaintiff did not introduce objective medical evidence to support the extent of the pain, but neither [may he be]...required to give full credit to every statement of pain, and require a finding of disabled every time a claimant states that she feels unable to work." See ***Rucker v. Chater***, 92 F.3d 492, 496 (7th Cir.1996); ***Pope v. Shalala***, 998 F.2d 473, 486 (7th Cir.1993).

There is no evidence that the ALJ disregarded Hackman's pain. In fact, in his opinion, the ALJ recognized that Hackman's impairments would be expected to cause pain. The ALJ acknowledged that Hackman complained of severe back pain that limited her ability to lift, sit, or stand and noted that Hackman returned to physical therapy on January 31, 2011, to help manage

her lingering symptoms. The ALJ also referred to a June 13, 2011 doctor's note where Hackman was found to have some tenderness, atrophy, and crepitus. The ALJ determined that in spite of the limited records of ongoing pain, the medical evidence did not support Hackman's complaints of disabling pain. The most recent medical records indicated that Hackman reported that her pain was a two out of ten, that she walked with a normal gait, and that she was improving with treatment. The ALJ also relied on examination notes which showed that Hackman was able to walk, lift a gallon of milk, had a normal gait, and could rise from a seated position without difficulty. Hackman criticizes the ALJ's opinion for relying on "hopeful remarks" but the ALJ pointed to sufficient medical records to support his conclusion. Because the ALJ both acknowledged Hackman's complaints of pain and supported his conclusion with multiple examination notes in addition to Hackman's own reports, the court finds that the ALJ adequately supported his conclusion and did not cherry-pick the evidence.

Hackman next complains that the ALJ inaccurately stated that Dr. Kucharzyk's notes indicated that Hackman had improved recently. Two days before Hackman's hearing, Dr. Kucharzyk noted that she had some tenderness, atrophy, and crepitus. However, the McMurray's, Apley's, bounce back hyperextension, pseudo-opening, and straight leg raising tests were well negative, and Hackman's sensory and motor functions of her lower extremities were mostly in tact. (Tr. 1120-1122). Dr. Kucharzyk stated that he could not assess Hackman's ability to work without further workup. Because Dr. Kucharzyk's report indicated some improvement, which was further supported by the notes prepared by Hackman's physical therapist, the court finds that the ALJ's statement was supported.

Hackman also criticizes the ALJ's opinion for failing to give her treating physician's

opinion controlling weight. A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. **20 C.F.R. § 404.1527(d)(2)**. *See also* **SSR 96-2p** (same); ***Schmidt v. Astrue***, 496 F.3d 833, 842 (7th Cir. 2007)(same); ***Gudgel v. Barnhart***, 345 F.3d 467, 470 (7th Cir. 2003)(same). Inconsistencies in a treating physician's opinion, whether conflicting internally or with other substantial evidence in the record, may justify denying the opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); ***Clifford***, 227 F.3d at 871. *See, e.g., Schmidt*, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for re-editing or rejecting evidence of disability."); ***Latkowski v. Barnhart***, 93 Fed. Appx. 963, 969 (7th Cir. 2004)(same). "[M]ore weight should be given to the opinions of doctors who have (1) examined a claimant, (2) treated a claimant frequently for an extended period of time, (3) specialized in treating the claimant's condition, (4) performed appropriate diagnostic tests on the claimant, (5) offered opinions that are consistent with objective medical evidence and the record as a whole." ***Roddy v. Astrue***, 705 F.3d 631, 637 (7th Cir. 2013). After evaluating these factors, if the ALJ chooses not to give the treating physician's opinion controlling weight, he is required to provide a sound explanation for his decision to reject it. ***Roddy***, 705 F.3d at 637.

The ALJ determined that Dr. Kucharzyk's opinion was vague and inconsistent with the record. The ALJ explained that much of Dr. Kucharzyk's opinion was left blank, including

crucial questions necessary to assess Hackman's RFC, such as her ability to walk.  Dr. Kucharzyk also stated that he could not give an opinion on Hackman's ability to work without further examination, which was not completed prior to the ALJ's opinion.  The ALJ explained that he could not afford Dr. Kucharzyk's opinion full weight "without completing the further workup he himself determined was necessary".  (Tr. 33) The ALJ also explained how Dr. Kucharzyk's opinion was inconsistent with other substantial evidence in the record.  Hackman's physical therapist noted that she was discharged with good prognosis for recovery, demonstrated improved lumbar motion and overall improved tolerance for activities, her pain levels were decreased, and she was able to return to some premorbid activities with minimal lumbar discomfort.  The decision to discharge Hackman from physical therapy was made in part due to an adequate functional level.  The ALJ's conclusion that Dr. Kucharzyk's opinion was not well supported is bolstered by his reliance on the inconsistencies between Dr. Kucharzyk's opinion and that of the physical therapist and Dr. Kucharzyk's own acknowledgment that he could not assess whether Hackman was capable of returning to work without a follow-up is well-supported.  This evidence, combined with the ALJ's explanation for relying on the opinions of Drs. Sands, Cobb, and Fife, render the ALJ's decision properly supported and consistent with the evidence of record.

Hackman next complains that the ALJ rendered an improper credibility determination.  First, Hackman argues the tasks that the ALJ used to suggest she was not disabled, including helping with heavy housework and walking while grocery shopping, were performed intermittently.  These tasks did not require the same exertion as full-time work.  Second, Hackman argues that because she provided evidence of her impairment, the ALJ should not use

minor inconsistencies to disregard her testimony. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported ... can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimaint's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir.2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and

statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." **20 C.F.R. §404.1529( c)**; *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005)("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.")

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also* *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. (internal citations omitted).

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994).

*See also* *Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory

statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, at *2.  *See **Zurawski***, 245 F.3d at 887; ***Diaz v. Chater***, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence).  He must "build an accurate and logical bridge from the evidence to [his] conclusion." ***Zurawski***, 245 F.3d at 887 (*quoting **Clifford v. Apfel***, 227 F.3d 863, 872 (7th Cir. 2000)).  When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting.  *See **Zurawski***, 245 F.3d at 888 (*quoting **Bauzo v. Bowen***, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

Hackman first points out that the ALJ relied on improper boilerplate language when making his credibility determination.  Although the Seventh Circuits has criticized the use of boilerplates, their use is not reversible error if the ALJ further supports his decision with the record. ***Yost v. Astrue***, 2012 WL 2814347 (N.D. Ill. July 10, 2010)(citing *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011).  The ALJ did not end his analysis with this boilerplate statement.  Instead he went on to point to inconsistencies between Hackman's testimony and the medical evidence upon which he relied and Hackman's reported daily activities.   The ALJ explained that Hackman's physical therapy and doctor's notes revealed improvement over time.  She was able

to perform activities on these visits which she testified she could not perform, and the ALJ stated that he found Hackman's daily activities inconsistent with the limitations she testified to.

Hackman challenges the ALJ's reliance on her daily activities because they were performed intermittently and do not show that she could have sustained work on a regular basis. The notes to SSR 96-8P explain that the "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." When making this determination, the ALJ may consider the claimant's daily activities. If the ALJ places significant weight on a claimant's daily activities to support a finding that the claimant can sustain employment, the activities must reflect that the person is capable of engaging in work eight hours a day for five consecutive days a week. *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). *See also* *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013); *Roddy v. Astrue*, No. 12-1682 (7th Cir. Jan. 18, 2013). To show this, the record should reflect that the claimant engages in such activities for a substantial part of the day. *Carradine*, 360 F.3d at 756. Evidence of sporadic physical activity is not sufficient because a claimant may engage in sporadic activities despite pain, but may not be able to engage in continuous activity for an 8-hour workday. *Carradine*, 360 F.3d at 756. Moreover, the activities must be transferable to a work setting. *Carradine*, 360 F.3d at 756. "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons..., and is not held to a minimum standard of performance, as she would be by an employer." *Hughes*, No. 12-1873. The ALJ must make a clear record that the claimant's activities are such that the claimant could perform duties

common to the work place on a sustained basis.  *Carradine,* 360 F.3d at 756.

In *Carradine*, the claimant testified that she could drive, shop, and do housework. *Carradine,* 360 F.3d at 756.  The ALJ relied on this when determining that the claimant was capable of working.  *Carradine,* 360 F.3d at 756.  On appeal, the Seventh Circuit explained that although the claimant could perform these activities, the claimant performed the reported activities on a sporadic basis, and the record was not clear whether these skills related to a work setting or whether the claimant could sustain activity on a continuous basis during an 8-hour work day.  *Carradine,* 360 F.3d at 756.  The Seventh Circuit remanded for further explanation of how the claimant's reported daily activities were consistent with a finding that she could engage in work eight hours a day, five days a week.  *Carradine*, 360 F.3d at 756.

The ALJ discredited Hackman's testimony in part because she was able to "drive short distances, dress herself without difficulty, perform light housework and help with heavy housework, and walk thirty-five minutes while shopping."  (Tr. 32) The ALJ did not explain how Hackman's daily activities would translate into completing tasks on a continuous basis during an eight-hour work day, nor did the Commissioner address this argument in his response.  It is not clear how Hackman's ability to perform these intermittent activities would affect her ability to do a sustained activity on an 8-hour basis and also how the activities she performed would translate into skills required to maintain employment.  Sporadic skills necessary for survival may not translate into skills useful during employment.  Because the court cannot conclude independently what tipped the scales against a finding of disability, and the ALJ did not adequately explain how these skills translate into the ability to perform work on an 8-hour basis, the court REMANDS the decision.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED** for further proceedings consistent with this order.

ENTERED this 18th day of March, 2013

/s/ Andrew P. Rodovich

United States Magistrate Judge